IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRADLEY W. SCOTT,

   *Petitioner*,

v.

GREGORY COLLETT, District Director, U.S. Citizenship and Immigration Services, et al.,

   *Respondents*.

Civil Action No. ELH-13-02022

**MEMORANDUM OPINION**

Bradley Scott, who is self-represented, filed a petition for review of the denial of his application for naturalization ("Petition" or "Pet.", ECF 1). He has sued Gregory Collett, District Director of the United States Citizenship and Immigration Services ("USCIS"), and the United States Department of Homeland Security ("DHS") (collectively, the "Government").[1] The Government has filed a motion to dismiss for failure to state a claim, or alternatively, for summary judgment ("Motion", ECF 14), supported by a memorandum of law (ECF 14-1).[2] Plaintiff did not respond.[3]

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will construe the motion as one for summary judgment and grant it.

---

[1] The Government responded on behalf of Collett and Jeh Johnson, Secretary of the Department of Homeland Security.

[2] Both parties have attached exhibits to their respective filings. *See* Petition (ECF 1-1 at 1 to ECF 1-1 at 14); Motion (ECF 14-4 to ECF 14-21).

[3] In accordance with *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), Mr. Scott was informed of his right to file a response to the motion, and the opportunity to submit affidavits, declarations, and other documentary evidence. *See* ECF 15. But, he has not done so.

**Factual Background**

Mr. Scott, a native and citizen of Jamaica, was born in 1959. ECF 1. He married Starlene Scott,[4] a U.S. citizen, in Baltimore County, Maryland on October 14, 2005. On October 17, 2005, Ms. Scott filed with USCIS a Form I-130, Petition for Alien Relative, seeking a visa for Mr. Scott based on his status as her spouse. ECF 14-4. On September 29, 2006, Mr. Scott filed with USCIS a Form I-485, Application to Register Permanent Residence or Adjust Status, in order to adjust his status to lawful permanent resident. ECF 14-5. The I-485 application was signed by Scott, under penalty of perjury, certifying that the "application and the evidence submitted with it is all true and correct." *Id.* at 4.

On the I-485 application, Mr. Scott listed Starlene Scott as his "present" wife. *Id.* at 2. On the G-325A form for biographical information, Mr. Scott listed Petral Taylor as his "former" wife. ECF 14-6. Mr. Scott indicated that he and Ms. Taylor were married in Clarendon, Jamaica on December 19, 1981, and divorced in Calpulalpan, Mexico on August 4, 2004. *Id.*

As proof of his divorce from Ms. Taylor, Mr. Scott attached to the I-485 application and G-325A form a Mexican divorce decree bearing the case number "160/2004," and an English language translation of the divorce decree. Divorce Decree, ECF 14-8; English Translation of Divorce Decree, ECF 14-7. The divorce decree indicated that the divorce was granted by the Honorable Josue Casas Calderon, a judge in the "Civil Court of First Instance" in Calpulalpan, State of Tlaxcala, Mexico, and that Pablo Aquiahuatl Lopez was the Clerk of Court certifying the decree. ECF 14-7; ECF 14-8.

---

[4] The I-130 petition states that Ms. Scott previously used the surnames "Saliard" and "Crump," but does not indicate what surname Ms. Scott used directly prior to her 2005 marriage. ECF 14-4.

Mr. Scott's I-485 application was approved by USCIS on May 16, 2007. *See* ECF 14-5 at 1. On March 11, 2009, the Scotts jointly filed a Form I-751, Petition to Remove Conditions on Residence with USCIS. ECF 14-9. Mr. Scott checked the box noting that his conditional residence was based on his marriage to a United States citizen or permanent resident, *id.* at 1, and certified that such marriage was entered into in accordance with the laws of the place where the marriage took place and was not for the purpose of obtaining an immigration benefit. *Id.* at 2. USCIS approved the I-751 petition on September 24, 2009. *See id.* at 1.

In March 2009, however, an investigation was initiated concerning the authenticity of Mr. Scott's Mexican divorce decree. Declaration of Jaclyn Grigoli, DHS Fraud Detection National Security Officer, at ¶ 8 ("Grigoli Decl.", ECF 14-11). Officials from the Department of State provided USCIS with a list of names of judges and clerks whose names appear on forged Mexican divorce decrees, and maintained that all divorce decrees purportedly signed and issued by Josue Calderon and Pablo Aquiahuatl Lopez were fraudulent. *Id.* at ¶ 9.

On March 22, 2010, Mr. Scott applied for naturalization by filing with USCIS the Form N-400, Application for Naturalization. ECF 14-15. On the form, Mr. Scott answered "No" to questions asking whether he had ever "committed a crime or offense for which he was not arrested"; "been married to more than one person at the same time"; or had "given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal." *Id.* at 8. Under penalty of perjury, Mr. Scott certified that the information contained in the naturalization application was true and correct. *Id.* at 10.

An Immigration Services Officer conducted a naturalization interview on June 24, 2010, at which time Mr. Scott affirmed the responses he provided on the N-400 application. *Id.* at 10. During the interview, Mr. Scott maintained, under oath, that he divorced Ms. Taylor because she abandoned him and that he filed for divorce and obtained it in Mexico because it was less expensive. Record of Sworn Statement (ECF 14-16).

On June 18, 2011, USCIS issued a Notice of Intent to Deny ("NOID") Scott's application for naturalization. ECF 1-1 at 3-7. The NOID explained that Mr. Scott's marriage to Ms. Taylor was never legally terminated, and therefore he was not eligible for classification as the spouse of a U.S. citizen, nor had he been lawfully admitted for permanent residence. ECF 1-1 at 6. Additionally, USCIS determined that Mr. Scott's false testimony regarding his marital status precluded him from establishing good moral character, as required by Section 316(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1427(a). *Id.*

In response to the NOID, Mr. Scott submitted a sworn statement dated July 13, 2011, maintaining that he had not provided false testimony to obtain an immigration benefit. ECF 14-17. In reference to Ms. Taylor, Mr. Scott asserted: "We wanted to dissolve our marriage expeditiously because we had been separated since 2000 and when we finally decided to legally end our marriage we did not want to rely on the Jamaican legal system because of its lengthy delays." *Id.* at ¶ 3. He explained that because of "the long wait time in Jamaica to obtain a divorce," the couple was divorced in Mexico. *Id.* Moreover, Mr. Scott claimed that he had no reason to doubt the validity of the Mexican divorce decree that he submitted to USCIS. *Id.* Mr. Scott recounted that he met his current wife, Starlene Scott, in July 2005 when she was vacationing in Jamaica. *Id.* at ¶ 4. They married three months later.

Nevertheless, on August 7, 2012, USCIS denied Mr. Scott's application for naturalization (Form N-400), on the same grounds asserted in the NOID. ECF 1-1 at 8-11; ECF 14-10. On or about September 11, 2012, Mr. Scott filed a Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings. *See* I-797C, Notice of Action of September 13, 2012, ECF 1-1 at 12.[5]

In the meantime, on November 14, 2012, in the Circuit Court for Baltimore County, Mr. Scott obtained another divorce from Petral Taylor. *See* I-601 Application, ECF 14-19 at 3. A month later, on December 14, 2012, Mr. Scott and Starlene Scott remarried in the Circuit Court for Baltimore County. *Id.* Then, on or about January 8, 2013, Mr. Scott submitted a new I-485 application to USCIS on the basis of his December 14, 2012 marriage, as well as a Form I-601, Application for Waiver of Grounds of Inadmissibility. I-485 Application of 2013, ECF 14-18 at 1-5; G-325A Form of 2013, ECF 14-18 at 6; I-601 Application, ECF 14-19. And, Ms. Scott submitted a new Form I-130, seeking derivative status for Mr. Scott as her spouse.

A hearing on Mr. Scott's application for naturalization was scheduled for January 31, 2013. ECF 1-1 at 13. However, Mr. Scott did not appear. *See* ECF 1; Decision Reaffirming Denial of Form N-400, ECF 1-1 at 14. In his Petition, Mr. Scott claimed that he had a scheduling conflict on January 31, 2013, and asked to reschedule the interview, but his request was not accommodated. ECF 1, ¶ 12.

On March 19, 2013, USCIS reaffirmed the denial of Mr. Scott's application for naturalization (N-400) on the ground that the inaccurate information he gave about his marital

---

[5] The Form N-336 was not submitted as an exhibit. However, the Form I-797C, Notice of Action of September 13, 2012, confirms that the Form N-336 was received on September 11, 2012. ECF 1-1 at 12.

history constituted false testimony, thereby rendering Mr. Scott ineligible for naturalization due to lack of good moral character. ECF 1-1 at 14. The decision noted that Mr. Scott did not appear at the hearing on January 31, 2013, and "did not submit any correspondence to USCIS explaining why [he] was unable to appear for the subsequent interview." *Id.*

On May 1, 2013, Mr. Scott was interviewed by an immigration officer in connection with the I-485 application he submitted in January 2013 following his marriage to Ms. Scott on December 14, 2012. Sworn Statement, ECF 14-20. During that interview, Mr. Scott claimed, under penalty of perjury, that he and Petral Taylor obtained their divorce in Mexico by filling out divorce forms supplied by "someone who [had] connection in … it was legal connection in Mexico." *Id*. at 2. Mr. Scott testified that he did not recall the name of the person who gave him the form but that he met the person in Jamaica through an individual named Neville Jones, who had since died. *Id*. Mr. Scott stated that Neville brought the forms to a man named Alfredo James, who was "like a legal person in Mexico." *Id*. at 3. He also testified that he did not have a copy of the forms he completed, and could not recall the date on which he signed the forms. *Id*. Nor could Mr. Scott recall when Ms. Taylor signed the "forms." *Id*.

Mr. Scott testified that he did not appear in court in connection with the divorce proceeding, nor did he live in Mexico. *Id*. But, Mr. Scott testified that he obtained the divorce in Mexico "[b]ecause we need to get divorced at a less expensive rate so to speak – less costly," and it would be faster. *Id*. at 2. According to the Government, Mr. Scott's 2013 I-485 application was denied on June 6, 2013. ECF 14-1 at 11.

On July 12, 2013, Scott filed suit to obtain judicial review of USCIS's denial of his application for naturalization, pursuant to 8 U.S.C. § 1421(c), claiming that USCIS erred.

Additional facts will be included in the Discussion.

**Standard of Review**

As noted, Mr. Scott filed a petition for judicial review of the denial of his application for naturalization. A party whose application for naturalization has been denied may seek review in district court pursuant to 8 U.S.C. § 1421(c). "Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application." *Id*. *See Chan v. Gantner,* 464 F.3d 289, 291 (2d Cir. 2006) (per curiam) ("Judicial review of naturalization denials . . . is not limited to any administrative record, but rather may be on facts established in and found by the district court."); *United States v. Hovsepian,* 359 F.3d 1144, 1162 (9th Cir. 2004) (explaining that, "even if the INS is allowed to make the initial decision on a naturalization application, the district court has the final word and does not defer to any of the INS's findings or conclusions").

Nevertheless, the scope of such review is not broader than the authority Congress vested in the Attorney General to consider the petition in the first place, as "Congress alone has the constitutional authority to prescribe rules for naturalization." *Fedorenko v. United States,* 449 U.S. 490, 506 (1981) (footnote and citations omitted); *see Kariuki v. Tarango*, 709 F.3d 495, 503-04 (5th Cir. 2013). "[T]he courts' task is to assure 'strict compliance with the statutory conditions precedent to naturalization . . . .'" *Kariuki*, 709 F.3d 503-04 (quoting *Fedorenko*, 449 U.S. 490, 506–07 (1981).

In conducting review pursuant to § 1421(c), the district court may properly entertain motions for summary judgment. *See Kariuki*, 709 F.3d at 501; *Abulkhair v. Bush,* 413 F. App'x

502, 508 n.4 (3d Cir. 2011) (per curiam); *Cernuda v. Neufeld,* 307 F. App'x 427, 431 n.2 (11th Cir. 2009) (per curiam); *Chan*, 464 F.3d at 295-96.

Defendants have styled their motion in the alternative, as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or for summary judgment under Fed. R. Civ. P. 56. Plaintiff attached exhibits to his complaint, and defendants presented matters outside the pleadings in connection with the Motion. Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Fed. R. Civ. P. 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). This discretion "should be exercised with great caution and attention to the parties' procedural rights." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 149 (3d ed. 2004, 2011 Supp.). In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an

obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[6]

Summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Nemours and Co. v. Kolon Industries, Inc.,* 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). Generally, to raise adequately the issue that discovery is needed, the party opposing the motion must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Mr. Scott has not filed an affidavit under Rule 56(d). Nor has he indicated that he is need of discovery with regard to the Motion. Moreover, I am satisfied that it is appropriate to address the Motion as one for summary judgment, because it will facilitate resolution of the case.

---

[6] A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The Fourth Circuit has explained that the party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must" set forth specific facts showing that there is a genuine issue for trial. *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). And, the court must "view the evidence in the light most favorable to . . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

Moreover, because Mr. Scott is self-represented, his submissions are "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). However, the court must also abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Bouchat*, 346 F.3d at 526; *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993).

## Discussion

Citizenship may be conferred only in accordance with the terms of an authorizing statute. *Cody v. Caterisano*, 631 F.3d 136, 142 (4th Cir. 2011) (citing *INS v. Pangilinan*, 486 U.S. 875, 886 (1988)).  It is a "high privilege," *United States v. Schwimmer*, 279 U.S. 644, 649 (1929), and as such, in a naturalization proceeding, the burden is on the petitioner to establish, by a preponderance of the evidence, his or her eligibility for citizenship. *Berenyi v. District Director, Immigration and Naturalization Service*, 385 U.S. 630, 636 (1967); 8 C.F.R. § 316.2(b).

To qualify for naturalization, an applicant must establish, *inter alia*, that he or she: (1) resided continuously in the United States for at least five years after being "lawfully admitted for permanent residence;" and (2) has been "a person of good moral character" for the five years immediately preceding the filing of his application, and from the date the application is filed up to the date he is admitted for citizenship. 8 U.S.C. §§ 1427(a), 1429; 8 C.F.R. § 316.2; *see Injeti v. U.S. Citizenship & Immigration Servs.*, 737 F.3d 311, 315 (4th Cir. 2013). "[T]he burden is on the alien applicant to show his eligibility for citizenship in every respect," and any "doubts should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist.*

*Director*, 385 U.S. 630, 637 (1967) (internal marks and citation omitted); *see Dung Phan v. Holder*, 667 F.3d 448, 453 (4th Cir. 2012).

In his Petition, Mr. Scott asserts that USCIS's findings that he gave false testimony regarding his marital history and lacks good moral character are "defamatory and false." *See* ECF 1. Additionally, he asserts: "[USCIS] had two prior opportunities to review my marital history when I received my conditional permanent residence through my marriage to my United States citizen spouse in May 2007 and when I had the conditions on my permanent residency removed by [USCIS]." *Id.*

The Government argues that Mr. Scott has no right to relief because he was never lawfully admitted for permanent residence in the United States, as expressly required for naturalization. ECF 14-1 at 17-18. Moreover, the Government contends that Mr. Scott's representations regarding the dissolution of his marriage to his first wife and the submission of the phony Mexican divorce decree constitute false testimony for the purpose of obtaining an immigration benefit, which preclude him from establishing the requisite good moral character. *Id.* at 23-24.

As additional evidence regarding the lack of authenticity of Mr. Scott's Mexican divorce decree, the Government submitted a declaration from Jack McCarthy, Director of the USCIS Mexico City Field Office. ECF 14-13, Declaration of Jack McCarthy ("McCarthy Decl."). McCarthy attested that his office conducted further investigation regarding the authenticity of the divorce decree, and USCIS's investigator, Paola De los Cabos Gomar, procured documents from the Civil and Family Court officials of the Judicial District of Ocampo. *Id.* at ¶ 9. Included as an exhibit is a letter dated March 4, 2014, from Judge Jose Augusto Lopez Hernandez, advising

USCIS that the case number 160/2004 noted on the Scott divorce decree is actually a case number related to an alimony and child support proceeding of someone named Jose Roldan Lara against Ma De Los Angeles Roldan Bastida. ECF 14-4 at 2-3. The letter also states that "no file was found regarding Jose Casas Calderon," the judge who purportedly issued Mr. Scott's Mexican divorce decree. *Id.*

According to McCarthy, the judge presiding over the Civil and Family Court of the Judicial District of Ocampo in 2004 was Porfirio Hernandez Lopez, and not Josue Casas Calderon. McCarthy Decl. at ¶ 10. Additionally, McCarthy averred that the "Secretary of the Family and Civil Court of the Municipality of Calpulapan, State of Tlaxcala, Mexico" advised his office over the phone that any document signed by Josue Casas Calderon was "invalid." *Id.*

1. <u>Lawfully Admitted for Permanent Residence</u>

To qualify for naturalization, an applicant must be lawfully admitted for permanent residence to the United States. *See* 8 U.S.C. § 1429. The term "lawfully admitted for permanent residence" is defined as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(2).

In *Injeti*, 737 F.3d at 315-16, the Fourth Circuit addressed the definition of the term "lawfully" as used in 8 U.S.C. § 1101(a)(2). In deferring to the Board of Immigration Appeals' construction of the term, the Fourth Circuit stated, *id.* at 315-16 (emphasis in original):

> The Board of Immigration Appeals ("BIA") has explained that the term "lawfully" "denotes compliance with substantive legal requirements, not mere procedural regularity." *In re Koloamatangi*, 23 I. & N. Dec. 548, 550 (B.I.A. 2003) (internal quotation marks omitted). According to the BIA, an alien who has obtained LPR status by fraud—or who was *otherwise* not entitled to it—has not been lawfully admitted. *See id.* In other words, even in cases where there is no

indication of fraud, an alien has not been "lawfully admitted" if her admission, at the time it was granted, was "not in substantive compliance with the immigration laws." *See Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010).

The Fourth Circuit observed that the "BIA has applied this 'non-fraud' doctrine" in cases "ranging from those where a petitioner has obtained LPR status through the fraud of third parties to those where a petitioner has received LPR status due to an administrative oversight." *Injeti*, 737 F.3d at 316. An applicant whose status has been adjusted to lawful permanent resident and is subsequently determined to have been ineligible for that status "has not been 'lawfully admitted for permanent residence' because the 'alien is deemed, *ab initio*, never to have obtained lawful permanent resident status.'" *In re Koloamatangi*, 23 I & N. Dec. 548, 551 (B.I.A. 2003); *see Gallimore v. Attorney Gen. of U.S.*, 619 F.3d 216, 224 (3d Cir. 2010).

In this case, Mr. Scott did not obtain his lawful permanent resident status in a substantively proper manner. "In determining the validity of a marriage for immigration purposes, the law of the place of celebration of the marriage will generally govern." *Matter of Arenas*, 15 I. & N. Dec. 174, 174 (BIA 1975). Under Maryland law, a person cannot legally be in a bigamous marriage. If a person enters into a marriage with someone else, at a time when a prior marriage has not been terminated, the second marriage is void *ab initio*. *Ledvinka v. Ledvinka*, 154 Md. App. 420, 434, 840 A.2d 173, 181 (2003).

Mr. Scott was accorded lawful permanent resident status by virtue of his purported 2005 marriage to Starlene Scott, a U.S. citizen. However, the evidence reflects that, at the time Mr. Scott married Starlene Scott, his marriage to Petral Taylor had not been lawfully terminated. Therefore, his marriage to Starlene Scott was void under Maryland law. And, because Mr. Scott was granted lawful permanent resident status based upon an invalid Maryland marriage, he was

not *lawfully* admitted for permanent residence and is ineligible for naturalization. *See Moore v. Thompson*, No. 09-1747RBKKMW, 2010 WL 39863, at *7 (D.N.J. Jan. 27, 2010) (concluding that the applicant had not obtained lawful permanent resident status in a substantively proper way where her second marriage was void under New Jersey law due to bigamy); *see also Ros v. Napolitano*, No. 12-CV-321, 2013 WL 3479419, at *8-9 (E.D. Pa. July 11, 2013).

Mr. Scott's objections that USCIS had "prior opportunities" to review his marital history, when he received his conditional permanent residence and when the conditions on his residency were removed, is not dispositive as to his eligibility for naturalization.  As discussed, to establish that he was lawfully admitted for permanent residence, Mr. Scott must do more than simply show that his status was adjusted to that of a permanent resident; he must further demonstrate that the grant of that status was "in substantive compliance with the immigration laws."  Stated another way, the mere fact that Mr. Scott's status was adjusted to lawful permanent resident does not mean that he was "lawfully admitted," as required for naturalization.

Mr. Scott has not submitted any evidence that the Mexican divorce decree is authentic. Indeed, he does not appear to refute that the divorce decree was fraudulent.  Rather, he averred to the USCIS that he had no reason to doubt the validity of the divorce decree, and asserts in his Petition that he did not give false testimony regarding his marital history.  Even if Mr. Scott did not knowingly submit a fraudulent divorce decree or deliberately provide false testimony, he has nevertheless failed to show that, at the time of adjustment to lawful permanent resident, he was lawfully accorded such status, in compliance with all applicable statutory requirements.

Mr. Scott has not generated a material factual dispute to show he was legally entitled to the grant of permanent resident status that he received on May 16, 2007.  Thus, Mr. Scott was

not lawfully admitted to the United States. It follows that he is ineligible for naturalization as a matter of law. *See Injeti*, 737 F.3d at 318.

### 2. Good Moral Character

The Government also insists that Mr. Scott is ineligible for naturalization because he lacks good moral character. In this respect, it relies on Mr. Scott's false testimony for the purpose of obtaining an immigration benefit. Because I find that Mr. Scott has not satisfied his burden of establishing that he was lawfully admitted for permanent residence, which is fatal to his application for naturalization, I need not address this issue. *See Li Dang Ding v. Gulick*, No. 11-00070 SOM, 2012 WL 300475, at *6-7 (D. Haw. Jan. 31, 2012) (concluding that it would be futile to address the issue of whether the petitioner had good moral character because the court found that the petitioner was ineligible for naturalization); *see also Injeti*, 737 F.3d at 318-19 (explaining that, because the district court held that the petitioner was never lawfully admitted for permanent residence, and "a failure to satisfy any one of the statutory prerequisites renders an applicant ineligible for naturalization," the conclusion that petitioner's acts barred a finding of good moral character "was not essential to the district court's grant of summary judgment").

### Conclusion

For the foregoing reasons, the Government's Motion will be granted. A separate Order follows.

Date: July 23, 2014                  /s/
                                     Ellen Lipton Hollander
                                     United States District Judge